**Supreme Court**

No. 2015-57-C.A.

(P1/14-891BG)

State                                  :

v.                                  :

Anthony Moore.                                  :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                           :

v.                              :

Anthony Moore.                  :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.**  The defendant, Anthony Moore (Moore or defendant), appeals from a judgment of conviction on three counts:  first-degree murder; conspiracy to commit murder; and using a firearm when committing a crime of violence.  On appeal, Moore argues that the trial justice erred in:  (1) denying his motion for a new trial; (2) refusing to give an "empty chair" jury instruction; and (3) making certain evidentiary rulings.  For the reasons outlined below, we affirm the judgment of the Superior Court.

**I**

**Facts and Travel**

Before we summarize the relevant testimony adduced at trial, we briefly outline the events that led to the abovementioned charges.

This story started and ended because of a gun.  On or about January 31, 2014,[1] Seydina Limamou Ndoye wanted a gun for self-protection, so he sought the help of his friend, Alain Bedame.  Bedame suggested contacting Johnathan and James Gomez.  Ultimately, Bedame and

---

[1] Unless otherwise noted, all dates referenced in this opinion occurred in 2014.

Ndoye were swindled by the Gomez brothers, who stole Bedame's cell phone and $240. On February 4 Ashner Alexis (nicknamed "Pookie"),[2] a friend of Ndoye, stepped in to help get a gun—although now for the purpose of avenging the Gomez brothers' scam. Pookie took Ndoye and Bedame to defendant's home in Woonsocket. Also there was seventeen-year-old Robert Winston. After consulting with Moore, and at his direction, Bedame and Winston set out to pick up a shotgun. With a gun in tow, Bedame, Ndoye, Winston, and Pookie then left to inflict vengeance on the Gomez brothers. They headed to the Gomez household, where Winston knocked on the kitchen window. When someone approached, Pookie fired a shot through the same window. Someone was hit, but it was not their intended targets. Instead, a fatal shot struck an innocent nonparticipant, George Holland, who was visiting his girlfriend, Ebony Gomez, the sister of Johnathan and James.

As a result of these events, defendant was charged with first-degree murder (G.L. 1956 § 11-23-1), conspiracy to commit murder (G.L. 1956 § 11-1-6), and using a firearm when committing a crime of violence (G.L. 1956 § 11-47-3.2). A jury trial was held on these counts from October 6 to October 16. At the close of trial, on October 16, the jury returned a verdict finding defendant guilty on each count. On November 19, defendant moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The trial justice denied the motion on December 4. On February 12, 2015, defendant received two consecutive life sentences (for murder and discharging a firearm) and ten years for conspiracy, also to be served consecutively. The defendant timely appealed.

---

[2] Because Ashner Alexis was generally referenced by his nickname during trial, we refer to him as Pookie to avoid confusion.

Miguel Gomez, father of Johnathan, James, and Ebony, testified first.[3]  He stated that on February 4, he lived at 145 Colfax Street in Providence with his girlfriend and his three children.  On the evening of February 4, Miguel saw "a real bright flash and [heard] a bang."  He found Holland lying on "the ground" between the dining room and the living room.

Johnathan Gomez testified next.  At the time of trial, Johnathan was nineteen years old.  Johnathan indicated that he was familiar with Bedame, whom he knew by his nickname, "West Alan."  He noted that Bedame messaged him on Facebook looking for James because, a few days prior to February 4, he stole "some money and a phone" from Bedame.  Johnathan stated that the phone and money were stolen during a meeting between Johnathan, James, Bedame, and Ndoye.  Johnathan stated that James never intended to provide a gun; rather, he sought to merely steal the phone and cash.

After the fatal event on February 4, Johnathan indicated that he spoke with the police later in the evening and conveyed his belief that Bedame was involved in Holland's shooting.  When asked how he knew Bedame was responsible, he replied, "Some kid hit me up [on Facebook], said this n***a is looking for your brother. * * * When we catch you, I guess, kill him."  He explained that "they" planned to shoot his brother, James.

Ebony Gomez testified next.  She indicated that she knew Bedame from when he visited her home a few days before February 4 looking for James and Johnathan.  She also indicated that others joined Bedame; however, she could see only one of these people, whom she described as "kind of skinnier and he had glasses."  She described Bedame and the skinny kid's demeanor as "[k]ind of angry, aggressive."

---

[3] To avoid confusion between Miguel, Johnathan, James, and Ebony, we will refer to each by their respective first names.  No disrespect is intended.

Ndoye testified next. He stated that near the end of January, he became interested in buying a gun. He shared this interest with Bedame, his "associate" and former high-school classmate, who, in turn, contacted the Gomez brothers. He recalled that, around January 27 or 28, he and Bedame met up with the Gomez brothers to purchase a gun.[4] During the meeting, he gave James $240 and Bedame's cell phone, but "[James] exited the vehicle with Johnathan and they never came back."

Ndoye noted that on the day that James and Johnathan stole their possessions, he, Bedame, and two of Bedame's friends visited the Gomez household, but Johnathan and James were not home. Ndoye recalled that, when he and Bedame located Johnathan at some later point, Johnathan claimed that the money had been stolen. He indicated that "hostility and tension" permeated their conversation. He also explained that, notwithstanding Johnathan's refusal to turn over the money or phone, they gave him a ride a couple of blocks down the road.

Ndoye then detailed the events of February 4. He explained that he and Bedame wanted to visit the Gomez home that night to "have an altercation with them, a fight, or a shoot-out." Ndoye testified that he and Bedame sought to obtain a gun from Pookie, an associate of Ndoye's through school, who likewise resented Johnathan and James because they had allegedly stolen scrap metal from him a few months earlier.

Bedame and Ndoye then met up with Pookie, who directed them to go to Woonsocket to get a shotgun from one of Pookie's "boys," so all three traveled to a house on Rathbun Street in Woonsocket. Upon their arrival, a young man, whom Ndoye later identified as Winston, brought them upstairs. At the time, there was a party in progress at the house with twenty to twenty-five guests.

---

[4] The attorneys for both sides stipulated that the day of the meeting with the Gomez brothers for the supposed gun purchase was Friday, January 31.

Shortly after arriving, Ndoye spoke with defendant for about five to ten minutes. He recalled that Pookie told Moore that they wanted a gun. Ndoye recounted that in response to Pookie's request, Moore replied, "You come to the right place." Winston and Bedame then set out to get the gun and returned about five to ten minutes later with a shotgun wrapped in a Cape Verdean flag. He believed that it was a shotgun "[b]ecause they were hoisting it in a cautious manner and it was really long," and he could see the shotgun's brown "wooden butt." Ndoye stated that "[a]fter the gun was put on the table [he] did see red bullets, and it had a clear tip with [approximately eight small] pellets inside of it." He stated that Moore handed the shotgun and shells to Pookie, who placed it "inside his waistband, where his hip was."

Ndoye recounted that he, Pookie, Winston, and Bedame then left defendant's house. Moore, however, stayed back. The group traveled to Pookie's girlfriend's house, where Pookie and Winston changed clothes. From there, they drove to the Gomez home, where they planned "[t]o commit a shooting." They parked, and Pookie and Winston left the car while Ndoye and Bedame stayed back and waited. Ndoye saw Pookie "retrieve a long * * * object from the vehicle." He stated that Pookie and Winston "disappeared into the darkness" for about ten minutes. Ndoye recalled hearing a loud blast; and, shortly after, Pookie and Winston ran down the street and jumped into the car. Ndoye noted that Pookie was "ecstatic," exclaiming, "I got someone." Pookie told Ndoye that Winston knocked on the window and Pookie fired a shot when someone approached. After the shooting, all four then returned to Moore's party where, upon updating guests on what had transpired, Pookie received praise and congratulations. Ndoye also recalled that Moore shook hands with Pookie and Winston.

Ndoye confirmed that he pleaded guilty on July 10 to second-degree murder, conspiracy to commit murder, and discharge of a firearm. He stated that he received a ten-year sentence to

be served at the Adult Correctional Institutions (ACI) for conspiracy to commit murder; however, he had not yet been sentenced for second-degree murder. On the count of discharge of a firearm, Ndoye received a twenty-year suspended sentence, with probation, consecutive to his sentences on the other counts. Ndoye also indicated that he signed a cooperation agreement with the Rhode Island Office of the Attorney General, in which he agreed to testify honestly and exhaustively with respect to the events of February 4.[5]

On cross-examination, Ndoye described Moore as the leader of "SMG,"[6] which he described as "a group of young men that get together and commit legal acts." He justified his conclusion, stating, "[the younger males] would salute [Moore] and they followed his instructions. And the aura that certain individuals give off can lead you to suspect certain things." He recalled that about four people saluted Moore on the evening of February 4.

Bedame testified next. He stated that he knew Ndoye from parties and that the two primarily chatted on Facebook. He recalled that on January 31, he and Ndoye met James and Johnathan "[b]ecause they wanted to show [Ndoye] a gun." When they met, Bedame understood that they needed to drive somewhere to pick up the gun, because James and Johnathan did not bring it to their meeting. When they arrived at the new location, Johnathan asked to use Bedame's phone because he purportedly needed to call "his uncle" to get the gun. He recalled that he gave Johnathan his phone and its passcode, and Ndoye gave James $240. Although Bedame believed that Johnathan and James were to get the gun from their "uncle" and return to the car, they never returned. In the days following January 31, Bedame informed Johnathan

---

[5] In his agreement with the Attorney General, Ndoye agreed to plead guilty to an amended count of second-degree murder (count 1), conspiracy to commit murder (count 2), and an amended count of using a firearm resulting in injury, rather than death (count 3).

[6] SMG signifies Savage Mob Gangsters.

through Facebook that he knew that they had the money and phone, which he verified with a Facebook picture of James holding the phone.

Bedame testified that a meeting with Pookie occurred on February 4 to obtain a gun. Bedame and Ndoye met Pookie, and the group traveled to Woonsocket to get a shotgun. They arrived at Moore's apartment in Woonsocket, where he was hosting a party, at which Bedame suggested that more than ten people were present.

In Woonsocket, Moore asked Bedame if he could give "his brother" a ride and Bedame then drove the "young kid" (later identified as Winston) to a "house complex to the alleyway."[7] Winston entered one of the apartments in the complex and returned to the car with a black bag, which he put in the trunk. Bedame stated that, when he returned to Moore's apartment, Winston removed the item from the trunk. Bedame saw two shotguns and recalled that Ndoye played with one while Winston handled the other. He also observed "one [red] shotgun bullet" on the kitchen table.

Bedame testified that Winston addressed Moore "as a leader of his group." He stated that Winston was standing "like a general talking to a soldier." He also confirmed that Winston had his hands in front of him, with his back straight, and while in that position, Moore directed, "This is what I prepared you for." Bedame recalled that Winston replied, "Yes" or "Yes sir." He recalled Moore telling Pookie, "If [Winston] didn't do what I told him to do, to blow his f'ing head off."

Pookie told Bedame and Ndoye to get in the car. Joined by Pookie and Winston, they drove to Providence. Bedame confirmed that he observed a gun in Pookie's pants that resembled

---

[7] Bedame indicated during cross-examination that the "younger kid" whom he referenced throughout his testimony matched a photo shown of Winston.

the short shotgun he saw in Moore's house. From Woonsocket, they stopped for Pookie and Winston to change clothes. Everyone in the car then agreed to drive to the Gomez household, although Bedame was hesitant in carrying out their plans. When they arrived, Pookie and Winston exited the car and proceeded down the street while Bedame and Ndoye stayed back. Bedame heard a very loud bang, which prompted him to try to leave. While the car moved slowly down the street, Pookie and Winston ran to it and hopped in.

Bedame described the situation in the car: "Pookie * * * was talking about it like he was happy. He was talking about how the young kid knocked on the door. He came around, he seen somebody peeking, and he shot him. And he was laughing like it was the funniest thing * * * he ever seen in his life." He also indicated that after that, Pookie "said he feels like shooting somebody else." The group headed back to Woonsocket. Bedame indicated that, while he was in the car, James sent him a Facebook message, which read, "They're coming for you, Bro." After returning to Moore's house, Winston was "cheering like they won a football game," and Pookie was "laughing and stuff." Bedame didn't see Moore outside, noting that the last time he saw him was inside when he first visited the apartment.

Bedame testified that on February 7, the police visited him at home and took him to the Providence Police Department, where he remained in police custody for three days and gave multiple recorded statements. On June 11, Bedame entered into a cooperation agreement with the Attorney General, which was identical to Ndoye's.[8]

Bedame confirmed that he subsequently had seen Moore at the ACI. He recalled a conversation with Moore while in the same prison cell: "[Moore] told me not to testify against him. * * * He will make sure that our family will be safe." He clarified, "[I]f we [did] testify

---

[8] See footnote 5, supra.

against him, he will make sure his little people will go to my house and shoot my people, meaning my pops."

Detective Kenneth Court of the Providence Police Department was the state's next witness. He stated that he reported for duty on February 4 in response to a homicide. Detective Court testified that he visited the Gomez home "much later in the evening * * * to get an overview of what [he] was dealing with." At the Gomez home, Det. Court recalled seeing "[t]racks in the snow and the gunshot hole that was in the window in the closed blind." Detective Court also testified that on February 5, he, Sgt. William Dwyer, and Det. Daniel O'Connell visited Bedame's house. Bedame joined them at the police station, and upon arrival, gave a statement. From Bedame's statement, Det. Court became aware of Ndoye, Pookie, Moore, and Winston. Further, he indicated that the officers allowed Bedame to access Facebook to identify whom he claimed played a part in the homicide. Detective Court stated that he contacted Ndoye, who, accompanied by his father, came to the police station. He noted that Ndoye also gave a statement, which helped shift the officers' focus to identifying and bringing in Pookie, Winston, and Moore.

Detective Court stated that Pookie was eventually apprehended at his girlfriend's home in South Providence. After both Bedame and Ndoye identified Moore, Moore was apprehended at his home at 107 Rathbun Street in Woonsocket. Officers searched his home but did not uncover a firearm.

Detective Court also indicated that on February 9, Winston provided a statement. Winston spoke with police again on March 14, and he testified before the Grand Jury between March 24 and 26. During Winston's interview, Det. Court learned the name of Winston's then-

girlfriend, Brandi Lachance.  Detective Court spoke with her on a few occasions and visited Lachance's home to retrieve a letter she had.

Detective James Clift of the Providence Police Department's Bureau of Criminal Identification testified next.  He confirmed that on February 4 at around 9 p.m., he responded to a shooting at 145 Colfax Street with his partner, Det. Paul Renzi.  He recalled that, as he entered the kitchen of the home, he immediately observed a shotgun wadding.[9]  Detective Clift stated that the wadding appeared to have traveled through the window, and "it was just over six feet away from where the window was."  He recalled that the window was broken into multiple pieces, and he counted nine holes in its exterior screen.  He described the holes as significant because "a normal load of a shotgun shell when it's buckshot is nine."

Detective Clift stated that he attended Holland's autopsy the next morning, which Dr. Patricia Ogera performed.  He identified a photograph of Holland at the medical examiner's office, which he indicated conformed to Holland's appearance during the autopsy.  He also identified a close-up photograph of Holland's stomach that showed "the pattern of where the projectiles went into his body."  From this photograph, Det. Clift counted nine wounds, which he confirmed matched "the normal count of projectiles that are usually loaded within a double odd [sic] buck shotgun shell."  He also indicated that Holland's shirt, which he seized among other items of clothing, had nine holes in it consistent with the victim's wounds.  Detective Clift also seized evidence including "the screen that was on the outside of the house," footprint impressions from the backyard, and later, two oral DNA swabs taken from defendant.  On cross-

---

[9] Detective Clift explained that a shotgun wadding has several parts, including the outer casing, "a primer at the base, which causes an explosion from the inside," gunpowder inside, and projectiles.  He explained that projectiles could either be solid (a large-caliber bullet or a slug), or a buckshot, which includes multiple small lead balls.

examination, Det. Clift noted that he did not find a match from the footprint impressions he took at the scene and detectives were unable to locate any shotgun shells at the Gomez home.

Next, Lachance, Winston's ex-girlfriend, testified. She stated that she had known Moore for a couple of years and had seen him often. Lachance indicated that on the evening of February 4, she was at Moore's girlfriend's birthday party on Rathbun Street in Woonsocket with Winston. She stated that she saw Pookie, whom she had previously met at another party, arrive at the party with two others whom she described: "One was chubby and one was skinny, with glasses." She recalled, "I heard Pookie come in and ask [Moore] for a gun, and the chunky kid had got robbed where he was from, I think South Providence." She noted that Moore said he would help them.

Lachance described Winston and Moore's relationship, stating, "[t]hey knew each other from a while ago." She testified, "I remember seeing [Moore] telling [Winston] that he had to go on a mission for him. He had to go do something, and that [Moore] wasn't leaving because it was his girlfriend's birthday." She further recalled that "[Moore] had told [Winston] that if he didn't go do what [Moore] told him to do that [Winston's] life would be taken." Lachance also indicated that she had seen people, including Winston and Pookie, salute defendant on the night of February 4.

Lachance stated that Pookie, Winston, and the two others left the party for one to two hours. She noted, however, that only Winston and Pookie returned to the house. She also stated, "Pookie, [Winston], and the two other kids" "left again before that," but she could not recall for how long. She stated, "I just seen [Winston's] facial expression, and I seen Pookie go up to [Moore] and they gave each other a handshake and hug, and celebrated." Lachance then recalled that after she left the party, Moore called her phone and asked to speak with Winston. While on

speaker phone, Moore told Winston "that they had shot the wrong kid," specifically someone named George.

Lachance then discussed a letter that Moore wrote, dated May 8, and she identified his handwriting in the letter.[10]  She noted that the letter was addressed and sent to her cousin, who brought the letter to her.  She noted that Moore signed the letter using his nickname, Bing. Lachance then read the letter into the record.

In the letter, Moore stated that Lachance, Winston, Pookie, and others "snitched" on him.  He said that Winston told the police that Moore "MADE him go."  Moore wrote, "I'm the only one who didn't give statements to the police but while everyone is telling on me they all forget I know everything so I'm finna get a deal to testify[.] * * * I was ready to go to trial till I found out EVERYONE was telling on ME."[11]  Moore added, "Don't say [too] much through the letters the police read these.  But I may call you as a witness for trial to flip it on [Winston] with me. * * * Just tell the truth IF I have to call on you but say I was [too] drunk to understand s**t & I didn't have a clue of what they [were] about to do * * * ."  He added, "Go on facebook and put EveryONE of those RATS ON BLAST * * * ."[12]

Doctor Ogera, an Assistant Medical Examiner at the Rhode Island Office of State Medical Examiners, testified next.  Doctor Ogera testified that she performed Holland's autopsy on February 5.  She testified that x-rays taken displayed "nine projectiles in the lower torso," and she observed nine entrance wounds on Holland's body but zero exit wounds.  She also observed

---

[10] Alexandra Brodeur, a forensic scientist for the Rhode Island Department of Health, testified that she tested the letter's envelope for DNA, which revealed the predominant presence of Moore's DNA.

[11] Lachance clarified that "finna" as used in the letter was synonymous with "I'm going."

[12] When the state's attorney asked what "go on Facebook and put every one of those rats on blast" meant, Lachance indicated that it meant, "To put them on the spot. * * * [L]et people know that we're snitching."

- 12 -

"nine defects" (or holes) in the victim's shirt, corresponding to the defects in Holland's abdomen. She opined that Holland's death was caused by shot wounds to the torso and the manner of death was a homicide.

## II

### Standards of Review

A party may base a motion for a new trial "on the grounds that the 'weight of the evidence was not adequate to convict' a defendant." State v. Lopez, 129 A.3d 77, 83 (R.I. 2016) (quoting State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014)). "When addressing a motion for new trial which posits that the weight of the evidence was inadequate to support a conviction, the trial justice 'act[s] as a thirteenth juror, exercising independent judgment on the credibility of witnesses and on the weight of the evidence.'" Id. (quoting Fleck, 81 A.3d at 1133). To this end, a three-step analytical process is required whereby the trial justice must "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Fleck, 81 A.3d at 1134 (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." Heredia, 10 A.3d at 446. Under a fourth analytical step where the trial justice disagrees with the jury's verdict, "the motion will be denied if the trial justice determines that the evidence and the reasonable inferences drawn therefrom are so nearly balanced that reasonable individuals could differ." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (quoting State v. Rivera, 839 A.2d 497, 503 (R.I. 2003)).

Moreover, so long as the trial justice enunciated "a sufficient rationale for denying a motion for a new trial, the decision will be given great weight. Such a judgment will be disturbed only if the trial justice has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." State v. Lopez, 149 A.3d 459, 463 (R.I. 2016) (quoting State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994)). "This Court employs a deferential standard of review because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." Id. (quoting State v. Baptista, 79 A.3d 24, 29-30 (R.I. 2013)).

We conduct a de novo review of jury instructions. State v. Florez, 138 A.3d 789, 793 (R.I. 2016). "A charge need only adequately cover[ ] the law." State v. Davis, 131 A.3d 679, 689 (R.I. 2016) (quoting State v. Long, 61 A.3d 439, 445 (R.I. 2013)). "This Court examines the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and * * * review[s the] challenged portions * * * in the context in which they were rendered." Id. (quoting Long, 61 A.3d at 445). A trial justice must "ensure that the jury charge 'sufficiently addresses the requested instructions and correctly states the applicable law.'" Long, 61 A.3d at 445 (quoting State v. Sivo, 925 A.2d 901, 913 (R.I. 2007)). "[A]n erroneous charge warrants reversal only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." Davis, 131 A.3d at 689 (quoting Long, 61 A.3d at 445).

"We will not disturb a trial justice's evidentiary ruling without first determining that the ruling constitutes a clear abuse of his or her discretion." State v. Williams, 137 A.3d 682, 686 (R.I. 2016) (quoting State v. St. Michel, 37 A.3d 95, 100 (R.I. 2012)). "Furthermore, this Court

- 14 -

will not disturb the trial justice's ruling unless the abuse of discretion resulted in prejudicial error." Id. (quoting St. Michel, 37 A.3d at 100).

## III

## Discussion

## A

## Motion for a New Trial

On appeal, defendant asserts that the trial justice erred in denying his motion for a new trial. The defendant suggests that the depth of inconsistencies in the witnesses' testimonies cut against the witnesses' credibility to such an extent that a new trial is warranted. For instance, defendant references discrepancies with respect to the number in attendance at the party, where people were located during the party, and descriptions of the shotguns at the party. Additionally, defendant submits further error in the trial justice's denial because he failed to discuss: Ndoye's and Bedame's plea agreements, which he asserts "created a powerful incentive for them to shape their testimony"; "the documented penchant for lying exhibited in [Ndoye's and Bedame's] behavior"; and any impact that alcohol or marijuana may have had on the witnesses' memories. Further, defendant posits that the trial justice erred in failing to discuss "the critical meeting between Bedame and Ndoye after the murder but before they were in police custody when they discussed what to say to the police."

In deciding the motion for a new trial, the trial justice reasoned, "This case, like so many cases of this nature, typically rises or falls upon the credibility of witnesses. Here[,] the credibility of * * * Ndoye and * * * Bedame was critical to the State's case. If believed, * * * defendant's conviction was preordained." Although the trial justice recognized that the recounts of certain witnesses diverged, he deemed "those * * * of little import when juxtaposed to the

essence of their testimony in this case." The trial justice noted that the witnesses offered consistent testimony in the following respects: (1) the excursion to Woonsocket to get a firearm from defendant; (2) defendant sending off Pookie to commit a shooting at the Gomez household; (3) defendant enlisting Winston to join Pookie in their endeavor; and (4) defendant instructing Pookie to blow Winston's head off if he defied instructions. He acknowledged that both Bedame and Ndoye were "reasonably consistent" with respect to their trip back to Providence and their return to Woonsocket following the shooting. While he noted inconsistencies, the trial justice found, "they were not at all sufficient * * * as a front-row observer, to diminish their credibility as far as Moore's clear criminal involvement in a scheme to murder Gomez."

Finally, the trial justice recalled Lachance's testimony, which he deemed "instrumental" and "highly incriminating." He emphasized that Lachance's testimony also relayed that Moore enlisted Pookie and Winston "on a mission with a firearm" and detailed "Moore as fancying himself as some sort of a leader or general of his group of followers, even to the point of seeing others saluting him." The trial justice noted that Lachance conveyed that Moore at a later time declared that the wrong person had been killed, noting, "He apparently was simply expressing his disappointment that the wrong person was murdered." The trial justice highlighted the importance of Lachance's testimony in pinpointing what he described as "the death knell to * * * defendant's case: [The] Letter he wrote on May 8th, 2014 * * * while Moore was at the ACI." Thus, based on his credibility findings in regard to defendant's letter and the testimony of Bedame, Ndoye, and Lachance, the trial justice found the jury "well justified" in convicting defendant on all counts.

Although we, like the state and the trial justice, acknowledge that the testimonies of various witnesses diverged at points during trial, we nonetheless affirm the denial of the motion

for a new trial. In reviewing a trial justice's decision on a motion for a new trial, this Court has consistently distinguished between "inconsistencies on 'minor details'" and inconsistencies "on the crucial issues." See State v. Guerrero, 996 A.2d 86, 90 (R.I. 2010) (emphasizing trial justice's ruling that witness "never wavered in her testimony about the sexual assault incidents themselves"); see also State v. Whitaker, 79 A.3d 795, 803-05 (R.I. 2013) (affirming trial justice's denial of motion for a new trial even though "witnesses' testimony was rife with so many inconsistencies" because inconsistencies concerned subsidiary issues such as size and caliber of defendant's gun); State v. Jensen, 40 A.3d 771, 781 (R.I. 2012) (acknowledging "that the presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief").

Here, although the disparities between the various witnesses' recounts were numerous, they reflect no more than minor details. As the trial justice aptly described, the witnesses' testimony aligned when discussing crucial issues.

At bottom, defendant's arguments alleging omissions by the trial justice in his evidentiary discussion attack the trial justice's credibility determinations. In this regard, we view the trial justice's "credibility determinations 'through a prism of deference * * * .'" State v. Paola, 59 A.3d 99, 106 (R.I. 2013) (quoting State v. Ferreira, 21 A.3d 355, 367 (R.I. 2011)). Further, "the trial justice was under no obligation to exhaustively analyze the evidence or to explicitly articulate [his] rejection of the testimony of witnesses whom [he] did not find to be credible." Ferreira, 21 A.3d at 367. The trial justice explicitly recognized, "This case, like so many cases of this nature, typically rises or falls upon the credibility of witnesses." The trial justice recognized the diverging testimonies yet deemed them insufficient to lessen the witnesses' believability connected with "Moore's clear criminal involvement in a scheme to

murder Gomez." We see no reason to depart from our deference "to trial justices who experience firsthand the delivery and demeanor of a witness's testimony" and, as such, the denial of the motion for a new trial is affirmed. Paola, 59 A.3d at 106 (quoting Ferreira, 21 A.3d at 366).

## B

### Jury Instructions

The defendant next asserts that the trial justice erred in refusing to give an empty-chair instruction[13] to the jury with respect to Winston's absence at trial. Under current Rhode Island law, "an empty-chair instruction is only appropriate in the event that the requesting party first lays a foundation that the witness was available to the party who would be expected to produce that witness." State v. Rogers, 687 A.2d 1242, 1243 (R.I. 1996); see also State v. Ayotte, 693 A.2d 1032, 1033 (R.I. 1997) (mem.). "We have further stated that 'if the witness is equally accessible to both parties, no inference can spring from the failure of either party to call [the witness].'" Rogers, 687 A.2d at 1243 (quoting Avarista v. Aloisio, 672 A.2d 887, 892 (R.I. 1996)).

The defendant asserted below that, although Winston was available to both parties, the trial justice should have instructed the jury that they "may take an adverse inference with respect to the State's failure to call Mr. Winston." In essence, defendant asks this Court to alter our current jurisprudence regarding the appropriateness of such an instruction. Specifically, defendant suggests that an empty-chair instruction is proper even when the pertinent witness is available to both parties.

---

[13] We note that other jurisdictions label this instruction a "missing-witness" instruction.

The trial justice declined to give this particular instruction, citing its nonconformity with our current rule. Additionally, the trial justice found, "frankly, the so-called empty chair instruction or missing witness instruction is one that is actually disfavored in other jurisdictions * * * ." Although the trial justice allowed defendant's attorney to argue to the jury vis-à-vis Winston's absence at trial, he declined to give an instruction, which he labeled as akin to commenting on evidence or the lack thereof.

On appeal, defendant posits "that the fact that * * * defendant has no obligation to call witnesses or produce evidence" supports a rule that authorizes an empty-chair instruction regardless of a witness's availability to both parties. The defendant avers that current law in this context shifts the burdens of production and proof upon defendants in contravention of his due-process rights under the Fourteenth Amendment to the United States Constitution. Further, defendant argues that "[t]he damage from not having the benefit of such an instruction was exacerbated by the state's response to the Winston issue in its closing argument" because defendant suggests that the state erroneously suggested a lack of evidence with respect to whether Winston had a cooperation agreement.

We glean no reversible error in the trial justice's refusal to provide an empty-chair instruction.[14] First, we subscribe to the view of other jurisdictions that the decision as to whether

---

[14] While we acknowledge the creativity in defendant's argument, we are unaware of any case that deems a trial justice's discretionary declination to provide an empty-chair (or missing-witness) instruction incompatible with the Fourteenth Amendment to the United States Constitution. A survey of other jurisdictions is instructive. See, e.g., Miller v. Walker, 413 F. Supp. 2d 251, 260 (W.D.N.Y. 2006) ("Like the failure to give any other jury instruction, the failure to issue a missing witness instruction does not raise a constitutional issue * * * ."); Solis v. Walker, 799 F. Supp. 23, 24, 25 (S.D.N.Y. 1992) ("[S]uch an instruction is neither constitutionally required nor invariably appropriate. * * * For the courts to formulate * * * a constitutionally required missing witness instruction would represent a dubious contribution to accurate factfinding in the criminal justice process."); State v. Young, 779 A.2d 112, 120 (Conn. 2001) ("Because '[t]he giving of [an empty-chair] charge is purely an evidentiary issue and is not

to provide an empty-chair instruction lies within the sound discretion of the trial justice. <u>See,</u> <u>e.g.</u>, <u>Hoffman v. Caterpillar, Inc.</u>, 368 F.3d 709, 716 (7th Cir. 2004); <u>United States v. Lewis</u>, 40 F.3d 1325, 1336 (1st Cir. 1994); <u>United States v. Torres</u>, 845 F.2d 1165, 1170-71 (2d Cir. 1988); <u>United States v. Williams</u>, 604 F.2d 1102, 1117 (8th Cir. 1979). Moreover, the trial justice "permitted defense counsel to argue the inference themselves in summation." <u>Torres</u>, 845 F.2d at 1170. It remains notable that "[e]minent authority suggests caution in developing 'elaborate rules of law defining the circumstances when the right [to an empty-chair instruction] exists.'" <u>United States v. Myerson</u>, 18 F.3d 153, 160 (2d Cir. 1994) (quoting <u>Torres</u>, 845 F.2d at 1171). "This is particularly true in light of 'the usual aura of gamesmanship' that frequently accompanies requests for [an empty-chair] charge." <u>Id.</u>; <u>see</u> <u>also</u> <u>Torres</u>, 845 F.2d at 1170 ("[C]ourts have been reluctant to find a witness practically unavailable when it appears that the defense has no real interest in calling the witness to the stand, but merely is engaged in a form of gamesmanship in an effort to obtain [an empty-chair] charge.").

Here, the trial justice's refusal to give an empty-chair instruction was justified and wholly conformed to our established jurisprudence, which we decline to alter. Because Winston was available to both parties, the trial justice rightfully declined to provide an empty-chair instruction.

## C

### Evidentiary Rulings

Next, defendant submits that it was error for the trial justice to sustain the state's objection on cross-examination during Det. Court's testimony. This argument also pertains to

---

a <u>matter</u> <u>of</u> <u>constitutional</u> [<u>dimension</u>]' * * * the defendant's right to present a defense is not implicated by a determination that * * * a missing witness instruction is unwarranted.") (emphasis added).

Winston. On cross-examination, defendant's attorney asked whether Det. Court knew if Winston had a cooperation agreement. Following this inquiry, the state objected, and the trial justice sustained the objection. This question was stricken from the record.

On appeal, defendant concedes that "[t]here was no proffer by the defense as to what answer it expected would be offered." The defendant submits that despite the absence of a proffer, the circumstances surrounding the question crystallized what the defense had hoped to draw out: the presence of a cooperation agreement with Winston. While acknowledging that our present authority cuts against defendant's argument, Moore nonetheless avers that the circumstances of this particular question justify our review of the issue.

"When we review a contention that a defendant's right to cross-examination erroneously was limited by the trial justice, we look to whether the trial justice clearly abused his or her discretion when limiting the scope of the cross-examination." State v. Alston, 47 A.3d 234, 249 (R.I. 2012). Here, the trial justice was well within his discretion when he sustained the objection because inspection of the record demonstrates that "when the state objected to defendant's question, defendant did not make any offer of proof that the examination he intended to embark upon could lead to relevant evidence." Id.

Additionally, defendant submits that the trial justice erred in not striking some of Lachance's answers during her direct examination. Specifically, defendant takes issue with the trial justice allowing Lachance's answer to stand when she stated that "[Winston] had told [her] that he had the gun in his pants." Although defendant concedes that defense counsel "did not move to strike the answer nor did he explain the basis of his objection," defendant suggests that an explanation was unnecessary as "[t]his was clear hearsay. Lachance was testifying as to what Winston told her."

It is not necessary to address the merits of defendant's hearsay argument because this case implicates our often-iterated raise-or-waive rule, which provides that "an evidentiary objection must be <u>sufficiently</u> <u>focused</u> so as to call the trial justice's attention to the basis for said objection * * * ." <u>State v. Vieira</u>, 38 A.3d 18, 25 (R.I. 2012) (quoting <u>In re Jazlyn P.</u>, 31 A.3d 1273, 1280 (R.I. 2011)). Here, defendant "overlooks the fact that it is his duty to lodge specific objections on the record if he wishes to preserve them for appeal." <u>Whitaker</u>, 79 A.3d at 814-15.

## D

## Cumulative Effect Doctrine

Finally, the defendant asserts that the cumulative effect of the above-alleged errors warrants reversal in this instance. However, in light of our conclusions with respect to the above issues, "this argument has no merit because several rulings that individually are not erroneous cannot cumulatively constitute prejudicial error." <u>State v. Ashness</u>, 461 A.2d 659, 672 (R.I. 1983).

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to that tribunal.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Anthony Moore. |
| **Case Number** | No. 2015-57-C.A.<br>(P1/14-891BG) |
| **Date Opinion Filed** | February 27, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Jane M. McSoley<br>Department of Attorney General<br><br>For Defendant:<br><br>Robert B. Mann, Esq. |