October 30, 2017

**Supreme Court**

No. 2016-115-C.A.
(P1/14-2045AG)

State                           :

v.                           :

Chaquiro Blandino.                           :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State            :

v.        :

Chaquiro Blandino.     :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** The defendant, Chaquiro Blandino, appeals from a judgment of conviction after a jury found him guilty of (1) first-degree murder of Francis Rodriguez; (2) discharging a firearm during a crime of violence (murder), resulting in the death of Rodriguez; (3) assault with a dangerous weapon (a firearm) upon Marvin Vasquez; (4) discharging a firearm during a crime of violence (assault with a dangerous weapon), without causing injury to Vasquez; (5) discharging a firearm from a motor vehicle, creating a substantial risk of injury to Rodriguez and Vasquez; and (6) unlawfully carrying a pistol without a license. The defendant filed a motion for a new trial, which the trial justice denied. The trial justice imposed consecutive life sentences on counts 1 and 2; a consecutive ten-year sentence on count 3; a consecutive ten-year sentence, non-parolable, on count 4; and concurrent ten-year sentences, suspended with probation, on counts 5 and 6, to run consecutive to count 4. Before this Court, the defendant asserts that the trial justice erred when he denied the defendant's request to order the state to produce the investigative notes of Det. Angelo A'Vant of the Providence Police

Department. The defendant further contends that the trial justice erred when he denied the defendant's motion for a new trial. After careful consideration of the defendant's arguments and a thorough review of the record, we affirm the judgment of conviction.

# I

## Facts and Trial Testimony

There is little factual dispute in this case. It is uncontroverted that defendant shot and killed Francis Rodriguez on May 2, 2014. It is also undisputed that defendant had previously been robbed, shot, and frequently harassed by members of the "C-Block" gang.[1] The only question at trial was whether the killing of Rodriguez was a cold-blooded, premeditated murder or an act of self-defense. The jury found it to be the former.

The central issue on appeal is whether defendant was entitled to certain notes taken by Det. A'Vant during the course of his investigation. Those notes, defendant argues, may have contained information about the potential C-Block membership or association[2] of Rodriguez, the murder victim, and Vasquez, the main witness for the state. The defendant also posits that Det. A'Vant's notes could have included information about defendant's reputation to C-Block as a snitch and the gang's ensuing harassment of him. According to defendant, access to the notes would have helped him more effectively pursue and present his theory of self-defense. The defendant claims that that access would clearly have depicted the life-threatening violence he experienced at the hands of C-Block members and his resulting need to respond with deadly

---

[1] The C-Block gang derives its name from its base of operations around Congress Avenue on the south side of Providence, between Broad Street and Elmwood Avenue.

[2] Detective A'Vant explained the distinction between a member and an associate of a gang. He said that a gang member is someone who is involved in all the gang's criminal activities, including drive-bys and robberies—a member "rides and dies" with the gang. A gang associate, on the other hand, may be from the gang's area or be a friend of gang members, but an associate does not necessarily participate in the gang's crimes. Despite this loose affiliation, an associate of a gang risks being "labeled" as a member by rival gang members.

force when Vasquez and Rodriguez—purported members (or at least associates) of the gang—pulled a gun on him.

To effectively analyze defendant's claim, it is first necessary to parse through defendant's description of his tangled history with C-Block. In January of 2011, when he was sixteen years old, defendant went to see a girl. As he made his way into her home, a young male, who was later identified as a member of C-Block, pointed a gun at defendant and forced him to remove and hand over his pants, shirt, shoes, and watch. While defendant was in this state of undress, the C-Block member pistol-whipped defendant and demanded he leave the building. Needing no further invitation, defendant fled down the street. As he did, he was stopped by a Providence police officer. The defendant relayed to the officer that he had been robbed and beaten, and he later testified before a grand jury to that effect.

C-Block consequently labeled defendant as a snitch. Members of the gang began following defendant; first at his high school, then at the Community College of Rhode Island. The defendant claims he was assaulted with a baseball bat on one occasion. Out of fear, however, defendant simply endured the harassment. He never again reported a C-Block member to the police.

In November of 2013, defendant was working at his mother's restaurant, which is located on Elmwood Avenue just blocks away from C-Block's main territory on Congress Avenue. Behind the restaurant, defendant said, he saw C-Block members approaching and that one of them was flashing a silver gun.[3] The defendant jumped a fence and ran away as fast as he could. Despite his best efforts to escape, defendant was shot once in the back and once in the leg. He

---

[3] The defendant said that the individuals were readily identifiable as members of the gang because of their black hooded sweatshirts, which bore the words "I think I'm Geek." The defendant knew this to be a reference to a fallen C-Block member.

was forced to undergo surgery and remain in the hospital for over a week. When he recovered, defendant refused to cooperate with authorities during the prosecution of the C-Block member who was ultimately convicted and incarcerated for the shooting. The defendant maintained that he had learned his lesson after the 2011 robbery; he would not snitch on the gang again.

Despite his silence, defendant said that his troubles with C-Block continued. According to him, gang members knew that he worked nearby, and they continued to follow and harass him. On May 2, 2014, the day of Rodriguez's death, defendant testified that he was sitting in his mother's minivan outside the restaurant, waiting to make a delivery, when a green Subaru containing Rodriguez and Vasquez pulled up alongside his vehicle. The defendant testified that he knew both men from the local barbershop; he also declared that he knew them both to be C-Block members. According to defendant, Rodriguez drew his finger across his throat—a sign that defendant said he interpreted as a death threat. At that point, defendant drove off and picked up his friend, Nelson Pineda. The two drove around Providence, smoking marijuana and making deliveries for defendant's mother.

The defendant said that, later that afternoon, as defendant and Pineda were in the area of the restaurant, they saw the same green Subaru approaching them. Rodriguez and Vasquez were still in the car. The driver of the Subaru tried to block defendant's minivan at a stop sign, such that he could not turn left or right. Rodriguez emerged from the Subaru and yelled insults at defendant. Pineda later testified that defendant responded in a similar vein. The defendant was able to maneuver the minivan around the Subaru, but he said that, as he was pulling away, he heard a loud bang from the rear of the car and concluded that Rodriguez had hit the rear window.

Indeed, according to Pineda's testimony, Rodriguez struck the minivan with what looked to him like the barrel of a gun.[4] The defendant and Pineda got away, for the time being.

The defendant further testified that, at that point, having been confronted and threatened by Rodriguez twice in one day, he drove home and retrieved a gun.[5] Once back in the car, defendant said, he placed the gun to the right of the driver's seat, hidden from Pineda's view in the passenger seat. Pineda testified that he was too high from smoking marijuana to realize that they had stopped at defendant's house or that defendant returned in possession of a gun. The two then went back to the restaurant.

Around 8 p.m., defendant and Pineda were driving around again. This time, they stopped on Warrington Street to roll blunts.[6] The minivan was parked on top of a speed hump[7] on the right side of the road, facing in the direction of Broad Street, with the engine and lights off and the keys still in the ignition. As defendant was finishing cracking open a cigar, he opened his window to discard the tobacco. It was then that he noticed headlights approaching. When he looked more closely, defendant said, he realized it was Rodriguez's green Subaru yet again. Suddenly their open drivers' windows were mere feet apart.

The testimony of the witnesses diverged as to what happened next. The defendant testified that he saw Rodriguez leaning forward while Vasquez pointed a gun at him from the passenger seat. Thinking he was about to die, defendant testified, he ducked down and grabbed the gun from the floor with his right hand. The defendant said that, while still crouching, he

---

[4] It should be noted, however, that Pineda testified twice before the grand jury without mentioning either being present for the confrontation or witnessing Rodriguez with a gun.

[5] The defendant testified that he had obtained the gun from a friend, Shaquele Padilla, in exchange for marijuana, which defendant admitted selling.

[6] If one empties the contents of a cigar, it can be filled with marijuana and resealed. The finished product is a blunt.

[7] As opposed to a regular speed bump, a speed hump is approximately as wide as a car is long.

pointed the gun over his head and fired out the window; he could not recall how many times. The defendant then started the car and drove away, not knowing whether he had shot either Rodriguez or Vasquez. He said that he dropped Pineda off at his house. Pineda was called as a witness for the state; his testimony regarding the shooting substantially mirrored that of defendant.[8]

Vasquez, who was also called by the state, offered a markedly different version of events. He said that he and Rodriguez had spent the day simply driving around Providence smoking marijuana. Vasquez denied that any sort of verbal or physical altercation between defendant and Rodriguez had occurred earlier that day. According to Vasquez, neither he nor Rodriguez had a gun in the car when Rodriguez was killed. Vasquez claimed that, at the time of the shooting, he was high, reclined in the passenger seat, drinking a beer, staring into space, and dozing off. While Rodriguez was slowing down to cross the speed hump on Warrington Street, Vasquez said, he heard a sudden rapid succession of gunshots. As both men ducked, Vasquez testified, he looked to his left and saw Rodriguez, motionless and bleeding. Rodriguez was also unresponsive to Vasquez's questions. Thinking that Rodriguez was dead, Vasquez—a fugitive from justice who had previously been convicted of carrying a pistol without a license—fled the vehicle and walked to a friend's house. Vasquez said that he looked back only to find that Rodriguez still had not emerged from the stopped car. Vasquez claimed that he never saw who had fired at them and killed Rodriguez.

---

[8] Pineda admitted that the first time he testified before the grand jury, he had denied being in defendant's car during the shooting. His second version presented to the grand jury involved his telling defendant that he should have just fought Rodriguez rather than shooting him. Pineda's testimony at trial that Vasquez pointed a gun at defendant, necessitating self-defense, was first shared with a defense investigator the night before the trial began. After Pineda failed to appear in court in response to a subpoena, the trial justice then issued a body attachment to ensure his presence.

- 6 -

Ballistic evidence was introduced, and it lent further credence to Vasquez's recounting of the shooting. Detective Douglas Allin of the Providence Police Department's Bureau of Criminal Identification testified that he recovered six cartridge casings clustered closely together around the speed hump on Warrington Street. Farther down the street, toward Elmwood Avenue, Det. Allin discovered an expended projectile. Also, the processing of Rodriguez's Subaru, which had come to rest against a building, yielded three more projectiles: one that was imbedded in the left rear bumper, which had entered the vehicle just underneath the taillight assembly; a second partial fragment that was lodged in the driver's side rear door frame, which had entered directly above the molding; and a third in the glove compartment. That round had fragmented as it entered immediately above the glove compartment; copper jacketing from the projectile was found on the floor of the front passenger seat area. Detective Allin then proceeded to place a ballistic rod in the hole where the projectile entered above the glove compartment to test the trajectory from which it had been fired. He determined that the bullet had traveled through the open driver's window at an acute angle and passed through the passenger cabin before penetrating the dashboard and coming to rest in the glove compartment. Notably, Assistant Medical Examiner Priya Banerjee, M.D., testified that the bullet that killed Rodriguez entered the back of his neck and exited through his left eye orbit.[9]

Detective A'Vant testified that he was tasked with investigating who was responsible for the shooting of Rodriguez. After being informed of the suspect vehicle's registration, as relayed by a witness who saw the minivan fleeing from the scene, Det. A'Vant learned that the vehicle was registered to defendant's mother. Police officers responded to her address—where defendant also resided—to set up surveillance. There, they arrested defendant's brother, Johan

---

[9] Before trial, the state and defendant stipulated that a DNA profile obtained from the projectile in the glove compartment matched that of Rodriguez.

Blandino, on a charge of driving with a suspended license. Johan, who was on bail for a pending firearm possession charge, was brought to the police station and interviewed by Det. A'Vant. The next day, Johan indicated that he had additional information to share with Det. A'Vant; he later informed the detective about the location of the murder weapon. In a bush in front of the home of defendant's neighbor, Det. A'Vant uncovered a .40-caliber Smith & Wesson and an accompanying magazine.[10] While in the vicinity, Det. A'Vant also saw, behind defendant's house, the minivan used during the shooting. A warrant was issued for defendant's arrest as a result of the investigation. After ten months on the run, defendant turned himself in to the Superior Court in February 2015.

## II

### *Brady* & Rule 16

During the trial, Det. A'Vant brought a notebook with him when he resumed the witness stand for cross-examination. He testified that it simply contained the notes he had been taking throughout the trial. Defense counsel then asked whether Det. A'Vant had taken notes during the course of his investigation. Detective A'Vant conceded that he had. As to the whereabouts of those notes, he testified that "I believe I have the notepad * * * in my file – folder." Defense counsel responded, "If you could just provide that to me at some point, I'd like to see that." The state immediately objected and asked for a sidebar. The trial justice sustained the objection at that point, but he indicated that the state could not be heard on the issue until a later time.

Under cross-examination, Det. A'Vant disclosed that, because of the drive-by nature of the shooting, he initially believed that it might be gang-related. Defense counsel inquired into

---

[10] When Det. A'Vant searched the Providence Police database, he found a report of a stolen .40-caliber Smith & Wesson filed by Victor Padilla, the father of defendant's friend, Shaquele Padilla.

whether Det. A'Vant had pursued that theory. It was then revealed that Det. A'Vant had indeed interviewed members of C-Block. He did so because he was aware that Rodriguez had been associated with C-Block at some point in his life and that defendant previously had been shot and robbed by members of the gang.

However, Det. A'Vant testified that he did not take notes of all those interviews and that he could not recall if the information gleaned from those interviews had been recorded in any police reports. As Det. A'Vant explained, "[t]here is a lot of information that's relevant to this case, and all of that is recorded. Certainly, there's conversations that I have with dozens of people when I conduct investigations. Not all of that is recorded, no, if I don't deem it to be pertinent to the case." He testified that he did not consider his C-Block interviews to be important enough to record because "any hearsay or anyone who believed that the victim was part of a gang, associated with a gang, or was a gang member, it wasn't necessarily pertinent to me * * *, whether they're a gang member or not, that's not important to the investigation." Detective A'Vant summed up his role as an investigator as follows:

> "I'm not building a case for defense when I'm putting a case together. I'm building a case that's based on facts and circumstances that prove or disprove the guilt or innocence of your client. Whether or not the victim was, once again, associated or a member of a gang, in some cases it's not relevant. There was no evidence to show – to support the fact that this was some type of gang retaliation * * *."

When the trial justice later heard argument on whether Det. A'Vant's notes should be produced, the following arguments were made by counsel:

> "[PROSECUTOR]: The objection was concerning [defense counsel's] question about notes that Detective A'Vant generated in the course of the investigation and whether or not they were turned over to the defense. My objection is grounded in Rule 16. Rule 16 does not require the State to provide the notes of an investigator, specifically to the defense, and the rule simply requires that a

summary of the witness's expected testimony be given or documentation concerning what the witness is expected to testify to.

"As Detective A'Vant has already testified, anything that he may have memorialized in notes was also memorialized in other documentation, whether it be police reports that were provided or recorded interviews with certain individuals, or documents that Detective A'Vant retrieved as a result of his investigation, like the police report concerning Victor Padilla's stolen gun report or the RILET report of Marvin Vasquez. So whatever it is that Detective A'Vant is going to testify to in this case or has testified to, the State has given the defense in discovery a synopsis of that testimony or those documents specifically relating to what he did in the case. And I object to the inference that [defense counsel] is creating with the jury that something nefarious has occurred because Mr. – Detective A'Vant has not turned over his notebook relating to the investigation to the defense so they can create a self-defense motive in this case.

"[DEFENSE COUNSEL]: Judge, the detective's question – answers, Detective A'Vant's answers were clear that he created these notes, that he did an investigation. I'm asking to see what the notes were. He doesn't get – respectfully, I've known Detective A'Vant 18 years, he doesn't get to decide what's relevant and what gets turned over, Judge.

"THE COURT: And you don't get to forage through his notes either in the hopes that maybe you'll find something of interest to you. That's not part of *Brody* [*sic*]. It's not part of Rule 16. You don't get to do that. To the extent you wish to go through his notes, I'm not going to permit it."

On appeal, defendant asserts that the trial justice's determination was erroneous and that defendant was, indeed, entitled to the notes pursuant to both the state's discovery obligations pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure and defendant's due-process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). *See DeCiantis v. State*, 24 A.3d 557, 570 (R.I. 2011) ("[T]he Due Process Clause of the United States Constitution, as interpreted by the United States Supreme Court in *Brady * * *, and its progeny, 'requires that the state provide a criminal defendant with certain information.'" (quoting *State v. McManus*, 941 A.2d 222, 229 (R.I. 2008))); *State v. Briggs*, 886 A.2d 735, 754 (R.I. 2005) ("When a criminal

defendant requests discovery material concerning witnesses the state may call to testify at trial, Rule 16 obligates the state to produce 'only prior recorded statements of a witness, a summary of the witness's expected trial testimony, and any records of prior convictions.'" (quoting *State v. Chalk*, 816 A.2d 413, 418 (R.I. 2002))).

It is clear from the record that defense counsel did not know what he was looking for in Det. A'Vant's notes when he first requested to see them. Indeed, none of Det. A'Vant's testimony relating to C-Block and his investigation into the possibility that Rodriguez's murder might have been gang-related had yet been elicited. At that juncture, all defense counsel knew was that Det. A'Vant had taken notes during his investigation; defense counsel was merely hoping to find something useful in those notes. In fact, even at the sidebar—when defense counsel actually had more information available to him as to the potential contents of the notes— he argued only that Det. A'Vant was not the appropriate person to decide what material was relevant and what should be provided to defendant. It was the state, in its objection, that raised Rule 16, arguing that the discovery rule does not require the disclosure of investigative notes. And it was the trial justice, in making his ultimate ruling, who raised the ever-looming *Brady* issue. The defendant never so much as mentioned either Rule 16 or *Brady*, let alone argued that either required the state to produce Det. A'Vant's notes. Accordingly, no *Brady* or Rule 16 argument has been preserved for appeal. *See State v. Yon*, 161 A.3d 1118, 1128 (R.I. 2017) ("The raise-or-waive rule 'imposes upon litigants a duty to raise all their claims for relief in the trial court and *properly articulate them to a judge for a ruling*.'" (emphasis added) (quoting *D'Alessio v. State*, 101 A.3d 1270, 1278 (R.I. 2014))); *State v. Gomez*, 848 A.2d 221, 237 (R.I. 2004) ("As established by this [C]ourt, an issue that has not been raised and articulated

previously at trial is not properly preserved for appellate review." (quoting *State v. Donato*, 592

A.2d 140, 141 (R.I. 1991))).[11]

## III

## Motion for New Trial

### A

### Standard of Review

When a defendant moves for a new trial, "the trial justice acts as a thirteenth juror and

exercises independent judgment on the credibility of witnesses and on the weight of the

---

[11] Nevertheless, we pause to note that we can discern no merit in either defendant's *Brady* or Rule 16 argument. *Brady v. Maryland*, 373 U.S. 83 (1963) requires the state "to turn over information that '(1) constitute[s] either exculpatory or impeachment evidence and (2) [is] material to the outcome of the case or sentencing.'" *State v. Burnham*, 58 A.3d 889, 900 (R.I. 2013) (quoting *State v. Wyche*, 518 A.2d 907, 909 (R.I. 1986)). The defendant has failed to satisfy even the first prong. There is nothing in the record to indicate that Det. A'Vant's notes contained any exculpatory or impeachment evidence whatsoever.

Nor did Rule 16 of the Superior Court Rules of Criminal Procedure entitle defendant to comb through Det. A'Vant's notes. Rhode Island has "one of the most liberal discovery mechanisms in the United States." *State v. Huffman*, 68 A.3d 558, 568 (R.I. 2013) (quoting *State v. Oster*, 922 A.2d 151, 163 (R.I. 2007)). Notwithstanding this liberality, investigation notes of a testifying detective are not explicitly covered by Rule 16. *See* Rule 16; *State v. Briggs*, 886 A.2d 735, 754 (R.I. 2005). "But the state's discovery obligations extend beyond the literal language of Rule 16 * * *." *DeCiantis v. State*, 24 A.3d 557, 570 (R.I. 2011). This Court has held that "[w]hen evidence * * * may nonetheless be helpful to [the] defendant's effective cross-examination of a witness, a defendant's right to that evidence arises from the right of confrontation, and thus becomes an issue 'only when a defendant is improperly denied the ability to confront and to effectively cross-examine an adverse witness at trial.'" *State v. Chalk*, 816 A.2d 413, 418 (R.I. 2002) (quoting *State v. Kelly*, 554 A.2d 632, 635 (R.I. 1989)).

Here, defendant was not denied the ability to searchingly cross-examine Det. A'Vant on any and all issues pertaining to C-Block. Defense counsel elicited testimony that Det. A'Vant was aware that defendant had been robbed, beaten, followed, threatened, and shot by C-Block members over the course of the three years leading up to the murder; further, Det. A'Vant was aware that Rodriguez had at least been associated with that very gang in the past. The types of questions defense counsel asked during cross-examination of Det. A'Vant certainly were not "improperly restricted" by the absence of the detective's investigation notes. *State v. Brown*, 709 A.2d 465, 469 (R.I. 1998) (quoting *Kelly*, 554 A.2d at 635). Thus "the state's discovery obligations extend[ing] beyond the literal language of Rule 16" were never implicated. *DeCiantis*, 24 A.3d at 570.

- 12 -

evidence." *State v. Rosario*, 35 A.3d 938, 947 (R.I. 2012) (quoting *State v. Guerra*, 12 A.3d 759, 765 (R.I. 2011)). This requires a three-step analytical process "whereby the trial justice must '(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" *State v. Moore*, 154 A.3d 472, 481 (R.I. 2017) (quoting *State v. Fleck*, 81 A.3d 1129, 1134 (R.I. 2014)). "If the trial justice agrees with the jury's verdict, the inquiry is complete and the motion for a new trial should be denied." *State v. Lopez*, 149 A.3d 459, 463 (R.I. 2016) (quoting *State v. Staffier*, 21 A.3d 287, 290 (R.I. 2011)).

As long as the trial justice follows this procedure and articulates "a sufficient rationale for denying [the motion], the decision will be given great weight. Such a judgment will be disturbed only if the trial justice has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong." *Moore*, 154 A.3d at 481 (quoting *Lopez*, 149 A.3d at 463). "We apply such a 'deferential standard of review because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" *State v. Muralles*, 154 A.3d 925, 932 (R.I. 2017) (quoting *State v. Paola*, 59 A.3d 99, 104 (R.I. 2013)).

**B**

**Analysis**

The defendant argues that the trial justice clearly erred by overlooking and misconceiving material evidence in denying defendant's motion for a new trial. First, defendant asserts that the trial justice erred because he credited the testimony of Vasquez that he did not have a gun in his possession on the night of the murder. In light of Vasquez's history as a gang member and

fugitive from justice, to say nothing of the firearm-possession conviction on his record, defendant claims that Vasquez could not have been characterized as a more credible witness than either defendant or Pineda. Therefore, according to defendant, the trial justice should have accepted the testimony of Pineda and defendant that Vasquez indeed pointed a gun at defendant. Second, defendant maintains that the trial justice erred in finding that defendant's explanation of the shooting did not match the ballistic evidence. To the contrary, defendant argues that his testimony wholly accounts for and diminishes the ballistic evidence used against him. Finally, defendant avers that the trial justice erred in discrediting the testimony of Pineda and Johan Blandino due to their shifting stories. Their inconsistencies, defendant claims, are readily explained away by the same fear of C-Block that led defendant to remain silent when he was shot by a member of the gang.

The trial justice outlined his responsibilities in passing on a motion for a new trial, beginning first with his consideration of the evidence in light of the jury instructions. In so doing, he recognized that the case could be distilled to one issue: whether defendant fired on Rodriguez in self-defense.

The trial justice then proceeded to independently assess the credibility of the witnesses and the weight of the evidence. He began with Vasquez:

> "I recognize that Vasquez arrived on the stand with a fair amount of baggage, including a prior conviction for unlawfully carrying a pistol. He also admitted that he had spent the day smoking marijuana, but that apparently is how every witness, including the defendant, spent their days. In my view, notwithstanding all of his warts and blemishes, Vasquez was a credible witness."

The trial justice next considered Johan's credibility. Acknowledging the witness's awkward position in having to testify against his brother, the trial justice nonetheless found his failures of

- 14 -

memory to be "painfully and obviously perjurious." And the trial justice found that Pineda "wasn't much better." The trial justice discussed the fact that Pineda, between his two appearances before the grand jury and one at trial, had provided three different versions of events. The second version, in fact, was to the effect that he had said to defendant after the shooting that defendant "didn't have to shoot [Rodriguez], just could have fought him." As the trial justice remarked, "[s]o much for the claim of self-defense." The trial justice concluded that neither Johan nor Pineda had helped defendant; "[i]ndeed, their testimony at trial was antithetical to the defendant's interest."

Turning to defendant's credibility as a witness, the trial justice recited the following language from this Court:

> "[W]hen a defendant elects to testify, he runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth. * * * As long as there exists some other evidence of the defendant's guilt, disbelief of a defendant's sworn testimony is sufficient to sustain a finding of guilt." *State v. Mattatall*, 603 A.2d 1098, 1109 (R.I. 1992).

In that regard, the trial justice found that "the defendant's explanation at trial of how he fired the weapon was simply, in my view, and obviously so from this verdict and the jury's view, wholly unacceptable. The physical evidence just does not fit the defendant's explanation." First of all, the trial justice opined that, if defendant had fired the gun as he demonstrated during his testimony, the cartridge casings would have been within his vehicle, not outside of it on the speed hump. The trial justice further noted that the bullet holes in the rear of Rodriguez's car and the fatal shot that entered the back of Rodriguez's neck did not correspond with the driver's-window-to-driver's-window shooting that defendant described.

The trial justice summed up his assessment of the evidence as follows:

"The physical evidence clearly reflects that the defendant must have had his arm extended through the driver's window and aimed down the roadway as Rodriguez's car was leaving the speed bump.

"There is little question in my mind that the defendant had parked his van on the speed bump expecting, or at least hoping, he would spot Rodriguez, whom he claimed had been harassing him most of the day. The defendant had gone home to retrieve his gun, and he was lying in wait for Rodriguez. And when the opportunity finally presented itself, he took advantage of it and shot into Rodriguez's car deliberately, purposefully, and with the specific intent of killing him. This was in no way self-defense, and I reject that claim, as did the jury.

"I am well satisfied that the State easily and beyond a reasonable doubt demonstrated that the defendant did not act in self-defense. No gun was found in Rodriguez's car, and I disbelieve any suggestion by the defendant and by Nelson Pineda that there ever was a gun in the Rodriguez car."

Agreeing with the jury's verdict, the trial justice denied defendant's motion for a new trial.

It is clear to us that the trial justice followed the well-settled three-step analytical process set forth in our jurisprudence. *See Moore*, 154 A.3d at 481. In denying the defendant's motion, the trial justice "enunciated 'a sufficient rationale'" from which this Court can discern that he adhered to the proper analysis. *Id.* (quoting *Lopez*, 149 A.3d at 463). In fact, he provided well more than the requisite "few sentences of * * * reasoning on each point." *Yon*, 161 A.3d at 1130 (quoting *Muralles*, 154 A.3d at 932). His decision is thus due great weight. Moreover, our independent review of the record satisfies us that the trial justice "has [not] overlooked or misconceived material evidence relating to a critical issue * * * [and is not] otherwise clearly wrong." *Moore*, 154 A.3d at 481 (quoting *Lopez*, 149 A.3d at 463). The trial justice committed no error; therefore, his decision will not be disturbed on appeal.

**IV**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of conviction.  The record shall be returned to the Superior Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Chaquiro Blandino. |
| **Case Number** | No. 2016-115-C.A. (P1/14-2045AG) |
| **Date Opinion Filed** | October 30, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Jane M. McSoley<br>Department of Attorney General |
| | For Defendant:<br><br>Lara E. Montecalvo<br>Office of the Public Defender |