**Supreme Court**

No. 2014-294-C.A.

(P2/13-2441AG)

|   |   |
|---|---|
| State | : |
| v. | : |
| Tavell D. Yon. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2014-294-C.A.
(P2/13-2441AG)

State                                    :

v.                                    :

Tavell D. Yon.                          :


Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Tavell D. Yon, appeals from a May 2, 2014 judgment of conviction in Providence County Superior Court for constructive possession of a firearm after a conviction for a crime of violence,[1] in violation of G.L. 1956 § 11-47-5.[2]  On appeal, he contends that the trial justice erred in: (1) failing to suppress the defendant's statement with respect to the gun at issue in the case; (2) failing to "submit to the [j]ury the issue of the voluntariness of [the] defendant's alleged statement" with respect to the gun at issue; and (3) denying the defendant's motion for judgment of acquittal and motion for a new trial.  This case came before the Supreme Court, sitting at Woonsocket High School, for oral argument on April 26, 2017.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

---

[1]     The criminal information reflects the fact that defendant was previously convicted of possession of a controlled substance with intent to deliver.  In a chambers conference, prior to jury selection, defendant stipulated to having been previously convicted of a crime of violence.

[2]     The defendant was also charged with fraudulently receiving stolen goods, "to wit, a .40 caliber Smith & Wesson pistol, knowing the same to be stolen," in violation of G.L. 1956 §§ 11-41-2 and 11-41-5.  That count was dismissed prior to trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

# I

## Facts and Travel

In this case, a tip from a confidential informant led to the search of an apartment where defendant was located and the discovery of a firearm. The defendant was subsequently arrested. At the police station, he was asked if the gun found in the apartment was stolen, and he responded: "'[W]hat gun bought off the street isn't stolen?'" It was that statement which defendant sought to have suppressed before trial. We relate below the relevant portions of the suppression hearing.

## A

## The Suppression Hearing

### 1. The Testimonies of Detective John Bento and Detective Martin Hames

Providence Police Detective John Bento was the first witness to testify at the suppression hearing. It was his testimony that, on October 26, 2012, following an investigation that involved surveillance and the issuance of a search warrant, he and other members of the "Narcotics and Organized Crime Unit" executed the search warrant at 14-16 Monticello Street. He added that he and the other officers were searching for a firearm. Detective Bento testified that they "used force" to enter the apartment, at around 11:00 a.m., after there was no answer to a knock on the door. He stated that, upon entering the apartment, the officers detained Mr. Yon and his girlfriend, one Desiree Rodrigues. Detective Bento added that neither individual was placed in handcuffs and that they were seated at the kitchen table. It was the testimony of Det. Bento that a search of the apartment was then conducted and a firearm was eventually discovered. He stated in his testimony that, at that point, Mr. Yon and Ms. Rodrigues were placed "into custody and in cuffs." It was further Det. Bento's testimony that he immediately read both individuals

"their rights, their Constitutional rights" from a pre-printed card that he kept in his wallet. He added that, at the conclusion of reading from the card, he inquired whether or not Mr. Yon understood his rights and that Mr. Yon "acknowledged by saying yes, he understands." It was Det. Bento's testimony that, "[s]hortly after" he had read Mr. Yon and Ms. Rodrigues their rights, they were transported to the police station—"within ten, fifteen minutes."

The testimony of Providence Police Detective Martin Hames corroborated Det. Bentos's testimony. Detective Hames added that, during the investigation of defendant, he discovered that defendant had been arrested "numerous times" and had had his rights read to him in the past. It was also his testimony that he "observed Detective Bento reading the rights to both [defendant and Ms. Rodrigues];" he added that he also heard the rights being read. Detective Hames testified that, at the police station, about a half hour after he had heard Mr. Yon being read his rights, he proceeded to the interview room where Mr. Yon was handcuffed and asked Mr. Yon a single question—viz., whether "the gun was stolen." It was his testimony that Mr. Yon responded as follows to that question: "'[W]hat gun off the street wasn't stolen?'"

### 2. The Testimonies of Tavell Yon and Desiree Rodrigues

At the suppression hearing, Tavell Yon testified that, on October 26, 2012, as soon as the police entered the apartment, they "thr[e]w [him] on the ground" and "cuff[ed] [him]." He stated that he and Ms. Rodrigues were then seated in the kitchen. It was further his testimony that, after the gun was located, an officer said to him: "'[Y]ou're federally f***ed now, you're going down for this, you won't see the streets for a while.'" He added that Ms. Rodrigues told the police that the gun belonged to her and that they proceeded to put her in handcuffs. It was then his testimony at the suppression hearing that "[t]hat morning nobody read [him his] rights."

With respect to what occurred after he was taken to the police station, defendant testified that after being placed, alone, in an interrogation room at the police station, he was "processed." He further testified: "The guy who works down in the cellblock asked me was the gun stolen. I was like, I don't know what guns on the streets ain't stolen though." It is important to note that, when asked at the suppression hearing, defendant did not deny making that statement. He testified that he had known the man who asked him the question "for so many years;" he added that "he's an all right guy." He further testified that he did not think he was being "interrogated" or "question[ed]" at that time.

On cross-examination, defendant acknowledged that he had seen Miranda[3] rights being read on television. He was also confronted on cross-examination with a Miranda rights form that he had signed on a previous occasion. The defendant further answered questions on cross-examination with respect to his numerous previous encounters with law enforcement; and he testified that, on several other occasions, he also had not remembered being read his Miranda rights. He added: "I really don't pay attention when I'm getting arrested. I'm so mad, I don't pay attention to what officers are saying." When asked by the court, during cross-examination, whether he knew his rights, he stated that he could "repeat [them]," but he added that he did not "really understand all of them." In his testimony on cross-examination, he went on to state that he knew he had a right to an attorney and the right to remain silent.

Ms. Rodrigues also testified at the suppression hearing. It was her testimony that, when the officers entered the apartment on October 26, they "put [Mr. Yon] on the ground, cuffed him, put him at the table." It was further her testimony that, after the officers located the gun, she told them the gun belonged to her. She stated that an officer then said to her: "[O]h, you want to play

---

[3]     See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966).

games, you can come down to the station too;" she added that she was then arrested. Ms. Rodrigues stated in her testimony that she and defendant were not read their <u>Miranda</u> rights.

After the close of testimony at the suppression hearing, the trial justice issued a bench ruling denying defendant's motion to suppress the statement which he made at the police station with respect to the gun at issue—"'what gun off the street [is not] stolen?'" A trial then commenced which spanned four days in February of 2014. We relate below the salient aspects of what transpired at that trial.

## B

### The Testimony at Trial

After the trial justice's bench ruling on the motion to suppress, but before any testimony was taken at trial, the following colloquy took place out of the presence of the jury:

> "THE COURT: If the case is going to take a turn into the Miranda corner, I wouldn't be surprised, [defense counsel], if [the prosecutor] is going to want to get into some of the stuff [which] was disclosed during the course of * * * the hearings * * * relative to your client's knowledge of Miranda. The cases are, as I've already mentioned, pretty clear in that direction. I don't know that the state should be disadvantaged from not being able to use some of that relevant information in the course of a trial where the claim is the statement was made and it was not Mirandized.
> "[DEFENSE COUNSEL]: Judge, in light of the Court's ruling, I'm not going to touch on that at all. I'm simply going to ask Ms. Rodrigues if she was advised of her rights before she gave her statement [at the police station] and we can leave it at that.
> "THE COURT: Well, is there going to be any suggestion or argument or evidence that you want to proffer to this jury relative to your client making a statement that he was not Mirandized and that the human[e] practice rule ought to be invoked during the course of the --
> "[DEFENSE COUNSEL]: The what?
> "THE COURT: Human[e] practice rule. In other words, giving the jury that instruction on Miranda.
> "[DEFENSE COUNSEL]: Judge, I don't intend to argue that, under the Court's ruling, whether it was suggested or implied."

- 5 -

Subsequent to this exchange, the first witness was called to testify.

**1. The Trial Testimony of Detective Martin Hames**

Detective Hames was the first witness to testify at the trial. He testified that the police started surveilling defendant on October 24, 2012; he stated that they were surveilling 14-16 Monticello Street to determine whether defendant lived there. It was further his testimony that, on the basis of, <u>inter alia</u>, the information that the police gleaned through surveilling the house, they applied for a search warrant; he added that a search warrant was issued. Detective Hames stated at trial that he and his fellow officers executed the search warrant on 14-16 Monticello Street at about 11:00 a.m. on October 26, 2012. It was his testimony that, during the search of the premises, he found "male clothing" inside the drawers of the "dressers" in the bedroom.[4] He added that he "seize[d]" the following items from the bedroom: "a * * * wallet containing Mr. Yon's ID. There were a couple receipts inside * * *. There was some mail in his name for that residence also on the dresser." A "Cox Cable bill in the name of Tavell Yon for 16 Monticello, Unit 2F * * * dated October 12, 2012" and a "Vistaprint mail also in the name of Tavell Yon for 16 Monticello Street" were part of an exhibit at trial and were identified by Det. Hames as items he seized from the bedroom. He also noted in his testimony that the address listed on Mr. Yon's driver's license, which was also seized from the bedroom, was "583 Charles Street."

In the course of his testimony at trial, Det. Hames reiterated what he had testified to at the suppression hearing with respect to his contact with defendant at the police station; he stated that, about a half hour after he had left the apartment, he asked defendant, who was in an interview room at the police station at the time, whether the gun was stolen. He stated that defendant's

---

[4]     Detective Hames identified the "bedroom" as the room where defendant "was standing in the doorway and Ms. Rodrigues was on the bed" when police entered the apartment.

response was as follows: "'[W]hat gun bought off the street isn't stolen?'" He added, on cross-examination, that that was the only question he asked defendant.

**2. The Testimony of Detective Thomas Zincone**

Providence Police Detective Thomas Zincone testified that he was also involved in the surveillance of defendant and the eventual search of the apartment at 14-16 Monticello Street. He stated that the police had been conducting surveillance of that apartment prior to October 26 and had observed Mr. Yon leaving the apartment.

He further testified that, when the police entered the apartment to execute the search warrant, Mr. Yon was standing in "his boxer shorts and * * * a T-shirt in the doorway of a bedroom" and Ms. Rodrigues was "laying in the bed." It was further his testimony that he searched the living room, including the couch. Detective Zincone stated at trial that he found a firearm at the "end of the couch," "between the cushion and the armrest," by "put[ting his] hands in-between the cushions." He identified the gun introduced as an exhibit at trial as the one he located in the couch cushions.

On cross-examination, Det. Zincone stated that, in the course of the investigation which preceded the execution of the search warrant, he received information from a confidential informant that Mr. Yon was "residing" at 14-16 Monticello Street. It was further his testimony on cross-examination, that "[u]pon exiting the residence" after defendant's arrest, he saw defendant's name on the mailbox. He added that he did not remember Ms. Rodrigues stating that the gun belonged to her immediately after the gun was located in the apartment.

At the conclusion of the state's case, defendant moved for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. The trial justice denied the motion.

### 3. The Trial Testimony of Desiree Rodrigues

Desiree Rodrigues was the next and last witness to testify. She testified that, during the six or seven months preceding October 26, 2012, she lived at 16 Monticello Street and was "casual[ly] dating" defendant. It was her testimony that defendant lived at 583 Charles Street. She further testified that, after the gun was located in her apartment, she told the officers it was her gun. She explained during her testimony that she came to be in possession of the firearm because she had had a "bad encounter" with a customer at her place of employment and she was "scared." During cross-examination, she answered "Yes" when asked if she was being "stalked." She stated that another customer, whom she knew only as "Mike," had sold her the firearm; she added that she paid $500 for the gun. Ms. Rodrigues testified that one of the two places where she kept the gun was "inside the couch cushion." It was Ms. Rodrigues's further testimony that, at the police station after her arrest, she gave a statement to an "ATF agent"[5] and told him the "same story" about acquiring the firearm as she related at trial. She added that she never told defendant that she had purchased the gun.

Ms. Rodrigues was asked at trial to "explain" the fact that the Cox cable bill for her apartment was in defendant's name. She responded as follows: "I owed them money and lost my debit card. I asked him if he could put it under his name for me." She further testified, however, that defendant's name was not on any other utility bills, the lease, or the mailbox; she added that he did not have clothing at her apartment. It was her testimony that any male clothing found at her apartment was due to the fact that she "ha[d] two brothers and they stayed in [her] spare bedroom sometimes."

---

[5] It is clear from a reading of the entire record that, when Ms. Rodrigues made reference to an "ATF agent," she was speaking of an agent of the federal "Bureau of Alcohol Tobacco and Firearms."

On cross-examination, Ms. Rodrigues testified that, before purchasing the gun in question, she had never handled a firearm. She also stated on cross-examination that the night when she bought the gun was the "only time [she] had ever seen [Mike]" at her place of employment and that she "didn't talk to anybody" before she purchased the gun or have anyone accompany her when she went to purchase the gun. She also answered in the negative when asked if she had ever "talked to anybody about how to operate the gun." She acknowledged on cross-examination that she told the ATF agent who interviewed her at the police station that defendant stayed at her apartment "a majority of the time." She further testified on cross-examination that "[s]ometimes" she would leave defendant alone in the apartment.

Following the close of Ms. Rodrigues's testimony, defendant renewed his motion for judgment of acquittal, and the trial justice denied that motion.

Subsequently, on February 18, 2014, defendant was convicted by the jury on the one count before it. On February 24, 2014, defendant moved for a new trial, and a hearing was held on that motion on February 28, 2014. At the conclusion of that hearing, the trial justice denied the motion. The defendant was thereafter sentenced to eight years to serve. His notice of appeal was filed prematurely on April 22, 2014.[6]

## II

## Analysis

## A

## Motion to Suppress

On appeal, defendant posits that the trial justice erred in refusing to suppress his statement to the police with respect to the gun. Specifically, he argues that the police did not

---

[6] We note that, despite the fact that defendant's notice of appeal was filed prematurely, it was "nevertheless valid." State v. Chase, 9 A.3d 1248, 1252 n.2 (R.I. 2010).

provide <u>Miranda</u> warnings at the apartment or at the station, deviated from procedure, and failed to formalize his interrogation with written <u>Miranda</u> warnings.

## 1. Standard of Review

Prior to "a trial justice [admitting] a confession or a statement elicited during custodial interrogation, the state must first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in <u>Miranda v. Arizona</u>." <u>State v. Jimenez</u>, 33 A.3d 724, 733-34 (R.I. 2011) (internal quotation marks omitted); <u>see also</u> <u>State v. Armour</u>, 110 A.3d 1195, 1200 (R.I. 2015). We have stated that "a knowing and intelligent waiver may be executed when a defendant is apprised of the <u>Miranda</u> warnings, comprehends such warnings, and thereafter makes a voluntary statement." <u>Jimenez</u>, 33 A.3d at 735. Additionally, we have held that "[a] statement is voluntary if it is the product of [the defendant's] free and rational choice and not extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." <u>State v. Garcia</u>, 140 A.3d 133, 140 (R.I. 2016) (internal quotation marks omitted); <u>see also</u> <u>State v. Bido</u>, 941 A.2d 822, 836 (R.I. 2008).

When "reviewing the trial justice's denial of [a] defendant's motion to suppress * * * incriminating * * * [statements], we defer to the factual findings of the trial justice, applying a clearly erroneous standard." <u>Jimenez</u>, 33 A.3d at 732 (internal quotation marks omitted); <u>see</u> <u>State v. Linde</u>, 876 A.2d 1115, 1124 (R.I. 2005); <u>see also</u> <u>State v. Gonzalez</u>, 136 A.3d 1131, 1145 (R.I. 2016). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>Bido</u>, 941 A.2d at 835-36 (internal quotation marks omitted). We conduct a <u>de novo</u> review of "questions of law and mixed questions of law

and fact involving constitutional issues." Jimenez, 33 A.3d at 732 (internal quotation marks omitted); see State v. Barros, 24 A.3d 1158, 1179 (R.I. 2011); see also State v. Dennis, 893 A.2d 250, 261 (R.I. 2006) (stating that "the ultimate question of whether a confession was given voluntarily is legal in nature, and this Court undertakes a de novo review of questions of law") (internal quotation marks omitted). It has also been our policy to consider the "totality of the circumstances" when reviewing a trial justice's findings with respect to whether a Miranda waiver was knowing, intelligent, and voluntary. Jimenez, 33 A.3d at 734 (internal quotation marks omitted); see also Garcia, 140 A.3d at 140.

## 2. Discussion

The trial justice issued a bench ruling at the close of the suppression hearing. He began his ruling by explaining the law to be applied and detailing portions of the relevant testimony from the suppression hearing. He found defendant's testimony that he never heard his rights administered in the apartment to be "suspect because he said * * * that whenever he gets arrested, and it's pretty clear[ he has] been arrested on several occasions, he gets so angry that he pays no attention to what the police tell him." He further "credited" the testimony of Det. Bento and the testimony of Det. Hames that defendant was in fact informed of his rights at the apartment. Consequently, he found "by clear and convincing evidence [that] the rights were administered and announced by Detective Bento at the apartment before the defendant and Ms. Rodrigues were brought to the station." The trial justice proceeded to find "by clear and convincing evidence[] and from the totality of the circumstances that [the] defendant understood the rights." He noted that defendant had "completed and executed a rights [form] in the past." After citing several cases to support his decision, the trial justice concluded as follows:

> "In all, I am well persuaded by clear and convincing
> evidence and from the totality of the circumstances that the

- 11 -

> defendant was fully Mirandized, that he understood all of the warnings and that the statement he made that guns on the street are typically stolen was made with full awareness of his rights and that his decision to make that comment was a voluntary one without any overreaching by an officer at the police station, be it Detective Hames who heard the comment or the booking officer to whom the defendant said he disclosed it * * *."

Accordingly, the trial justice denied defendant's motion to suppress.

We begin our review by stating that we can perceive nothing in the trial justice's findings of fact that could be deemed clearly erroneous. See Jimenez, 33 A.3d at 732. The trial justice found Det. Bento and Det. Hames to be credible witnesses and defendant's testimony to be "suspect." Consequently, the trial justice found that defendant was administered his Miranda rights at the apartment, that he understood those rights, and that his statement was voluntary. As we have previously stated, "[w]e are mindful that the trier of fact, which in this case was the trial justice, is in the best position to assess the relative credibility of witnesses." Bido, 941 A.2d at 836. As such, keeping in mind that the trial justice found that defendant was administered his Miranda rights, we next proceed to conduct our own "independent examination of the record" to determine if the statement at issue should have been suppressed because defendant did not validly waive his Miranda rights. Gonzalez, 136 A.3d at 1145.

It is clear in the instant case that defendant had previous experience with the criminal justice system and had been read his rights on at least one previous occasion; he was specifically confronted, on cross-examination, with a form containing Miranda rights that he had signed after a previous arrest. See State v. Ferola, 518 A.2d 1339, 1346 (R.I. 1986) (stating that the defendant's "prior involvement in the criminal justice system is telling evidence * * * that the constitutional warnings given him by the [police] were understood") (internal quotation marks omitted). Moreover, defendant stated at the suppression hearing that he had seen Miranda rights

being read on television. See State v. Crowhurst, 470 A.2d 1138, 1142 (R.I. 1984) (stating that, in considering whether an individual understands his rights, "[o]ne may find out about the Miranda rights through * * * watching one of the many detective shows appearing on television, or by personal experience through previous contacts either with the police or with the courts") (internal quotation marks omitted). We further note that Det. Bento testified that Mr. Yon stated that he understood his rights after they were read to him at the apartment. The defendant further admitted on cross-examination that he could "repeat" his Miranda rights. As the trial justice also noted, defendant testified that he did not "pay attention to what the officers are saying" when he finds himself under arrest because he is "so mad." Finally, with respect to voluntariness, Det. Hames testified that, when defendant made the statement at issue, he was in an interrogation room and Det. Hames asked him a single question about whether the gun was stolen; there was no meaningful evidence that defendant was the subject of any coercion or improper inducement. Garcia, 140 A.3d at 140. Accordingly, it is clear to this Court, upon considering the totality of the circumstances, that defendant's waiver of his Miranda rights was knowing, intelligent, and voluntary. See Jimenez, 33 A.3d at 733-34; Barros, 24 A.3d at 1180.

To the extent that defendant suggests on appeal that the police should have read his Miranda rights to him a second time at the police station, we see no merit in that argument. This Court has never articulated such a requirement; and we note that, in the instant case, the testimony reflects that only approximately a half hour elapsed between defendant being read his rights and his making the statement at issue. See State v. Beaulieu, 116 R.I. 575, 584, 359 A.2d 689, 693-94 (1976) (upholding a trial justice's denial of a defendant's motion to suppress when nine hours had elapsed between the Miranda warnings being given to the defendant and the

interrogation during which the defendant made the statements at issue).[7] It is further the case that, to the extent defendant contends that he should have been given his <u>Miranda</u> rights in written form, we have likewise never imposed such a requirement. <u>See</u> <u>State v. Wilding</u>, 638 A.2d 519, 521 (R.I. 1994) ("There is no requirement that <u>Miranda</u> warnings be given in writing as a constitutional imperative.").

As such, in our judgment, the trial justice did not err in denying defendant's motion to suppress his statement with respect to the gun, which statement he made at the police station following his arrest.[8]

## B

### Failure to Submit Voluntariness to the Jury

The defendant contends on appeal that the trial justice erred in not submitting to the jury the issue of the voluntariness of his statement with respect to the gun. He avers that, in failing to do so, the trial justice violated the Humane Practice Rule,[9] the United States Constitution, and the Rhode Island Constitution.

---

[7]     <u>State v. Beaulieu</u>, 116 R.I. 575, 359 A.2d 689 (1976), was overruled on other grounds by <u>State v. Lamoureux</u>, 623 A.2d 9, 14 (R.I. 1993).

[8]     We note that defendant makes an argument that the trial justice "constrained" his cross-examination of Det. Bento during the suppression hearing in violation of his "right to compulsory process." However, we consider this contention to be unavailing. A review of the transcript of the suppression hearing indicates that the trial justice's purported "constrain[ing]" was actually a reaction to defense counsel's questions having strayed beyond the narrow scope of evidence that was relevant at the suppression hearing. <u>Cf.</u> <u>State v. Manning</u>, 973 A.2d 524, 531 (R.I. 2009) (stating, in the context of cross-examination at trial, that the "right may be constrained, however, within reasonable parameters of relevance in the exercise of the trial justice's discretion") (internal quotation marks omitted).

[9]     We have stated that "[t]he Humane Practice Rule requires that a trial justice in this jurisdiction, before allowing the admission of a defendant's inculpatory statement or confession into evidence, must make a preliminary determination that the statement or confession was made voluntarily. * * * In further accordance with the Humane Practice Rule, if the trial justice is

- 14 -

In addressing defendant's contention on appeal, we turn to the "well-settled raise-or-waive rule" which "precludes us from considering at the appellate level issues not properly presented before the trial court." State v. Merida, 960 A.2d 228, 236 (R.I. 2008) (internal quotation marks omitted); see also State v. Dennis, 29 A.3d 445, 449-50 (R.I. 2011). The raise-or-waive rule "imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling." D'Alessio v. State, 101 A.3d 1270, 1278 (R.I. 2014).

In our judgment, the raise-or-waive rule is dispositive of defendant's contention before this Court that the trial justice erred in not submitting to the jury the voluntariness vel non of his statement with respect to the gun. The defendant failed to request a Humane Practice Rule instruction, nor did he object to the lack of a Humane Practice Rule instruction in the trial justice's jury instructions. See State v. Mendez, 116 A.3d 228, 243 (R.I. 2015) ("With respect to objections to jury instructions in particular, this Court has consistently been exacting about applying the raise or waive rule.") (internal quotation marks omitted); see also King v. Huntress, Inc., 94 A.3d 467, 483 (R.I. 2014). Moreover, defendant went so far as to specifically state to the prosecutor and the trial justice, with respect to the issue of voluntariness, that he was "not going to touch on that at all." Indeed, upon being specifically asked by the trial justice if "there was going to be any suggestion or argument or evidence that [defendant] want[ed] to proffer to th[e] jury relative to [defendant] making a statement that he was not Mirandized and that the human[e] practice rule ought to be invoked," defense counsel replied as follows: "Judge, I don't intend to argue that." No doubt due to the statements of defense counsel, no evidence was

---

persuaded by clear and convincing evidence that the statement was voluntary, he or she then must, as an additional safeguard, give a specific instruction to the jury that it may consider the statement as substantive evidence only if it first finds that the statement was made voluntarily." State v. Dennis, 893 A.2d 250, 262 (R.I. 2006) (emphasis in original).

submitted at trial with specific relation to the voluntariness of defendant's statement about the gun. Accordingly, it is clear to us that the issue was waived.

## C

### Motion for Judgment of Acquittal and Motion for a New Trial

The defendant avers that the trial justice failed in denying both his motion for a judgment of acquittal and his motion for a new trial. He contends that the state failed to prove that he had constructive possession of the gun.

### 1. Standard of Review

It is well-settled law that "a defendant has a higher hurdle to overcome when arguing a Rule 29 motion for judgment of acquittal than when he seeks to prevail on a * * * motion for new trial [pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure]." State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014). Therefore, "[w]hen faced, as here, with both Rule 29 and Rule 33 motions, this Court first conducts a review of the new trial motion." Id. (internal quotation marks omitted); see also State v. Cardona, 969 A.2d 667, 672 (R.I. 2009).

A motion for a new trial may be argued on two different bases: the motion can be based upon the sufficiency of the evidence or the weight of the evidence. See Fleck, 81 A.3d at 1133; see also State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011). In his brief before this Court, defendant details the standard for a weight of the evidence analysis; and we shall, accordingly, analyze his contentions under that standard. See Fleck, 81 A.3d at 1134.

As we have consistently stated, "[w]hen addressing a motion for new trial which posits that the weight of the evidence was inadequate to support a conviction, the trial justice act[s] as a thirteenth juror, exercising independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Moore, 154 A.3d 472, 480 (R.I. 2017) (cert. pending) (internal

quotation marks omitted).  In conducting his or her analysis, the trial justice engages in "a three-step analytical process * * * whereby the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury."  Id. at 480-81 (internal quotation marks omitted); see also State v. Heredia, 10 A.3d 443, 446 (R.I. 2010).  If, after engaging in the just-detailed three-step process, "the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied."  State v. Muralles, 154 A.3d 925, 931 (R.I. 2017) (internal quotation marks omitted); see also Heredia, 10 A.3d at 446.  However, if after conducting the three-step analysis, the trial justice "does not agree with the jury verdict or does not agree that reasonable minds could differ," then he or she must embark on a fourth analytical step in order to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice."  State v. Robat, 49 A.3d 58, 71 (R.I. 2012) (internal quotation marks omitted); see also State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010).

We have stated that "with respect to a trial justice's ruling on a motion for a new trial, the record should reflect a few sentences of [his or her] reasoning on each point."  Muralles, 154 A.3d at 932 (internal quotation marks omitted).  But "[t]he trial justice need not * * * refer to all the evidence supporting the decision; rather, he or she need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards."  Id. (emphasis in original) (internal quotation marks omitted); see also Robat, 49 A.3d at 71.  "[S]o long as the trial justice enunciated a sufficient rationale for denying a motion for a new trial, the decision will be given great weight."  Moore, 154 A.3d at 481 (internal quotation marks omitted).

Accordingly, we "will not disturb a trial justice's decision on a motion for a new trial unless the trial justice committed clear error or * * * he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." Muralles, 154 A.3d at 932 (internal quotation marks omitted); see also DiCarlo, 987 A.2d at 871.

## 2. Discussion

We have stated that "[c]onstructive possession of an object occurs when an individual exercises dominion and control over such object even though it is not within his [or her] immediate physical possession." State v. Fisher, 844 A.2d 112, 116 (R.I. 2004) (internal quotation marks omitted). Two elements must be satisfied to find constructive possession: "the defendant must have had knowledge of the presence of the contraband and * * * must have intended to exercise control over the item[s]." State v. Ditren, 126 A.3d 414, 421 (R.I. 2015) (internal quotation marks omitted); see also State v. Santiago, 799 A.2d 285, 287 (R.I. 2002). Both of those elements "can be inferred from a totality of the circumstances." Ditren, 126 A.3d at 421 (internal quotation marks omitted). "[C]onstructive possession need not be exclusive; it can also be joint." Santiago, 799 A.2d at 287; see also State v. Mercado, 635 A.2d 260, 263 (R.I. 1993).

After a thorough review of the record, keeping in mind the just-cited criteria relative to constructive possession, we can detect no error in the trial justice's decision on defendant's motion for a new trial. The trial justice began with the first analytical step in the analysis of a motion for a new trial when he considered the evidence in light of the jury charge. See Moore, 154 A.3d at 480-81. He noted that his jury instructions had not been objected to, and he recognized that the "only issue [in the case] was whether or not the defendant possessed the firearm." He added that he had "spen[t] a fair amount of time talking about constructive

- 18 -

possession with the jury." He also noted that this case "resolve[d] itself to a test of witness credibility, which is quintessentially entrusted to the fact-finders."

The trial justice next proceeded to the second analytical step—assessing the credibility of the witnesses and weighing the evidence. See Heredia, 10 A.3d at 446. The defendant contends that Ms. Rodrigues's testimony was not given "meaningful consideration" by the trial justice, pointing specifically to her testimony that the gun found in the apartment belonged to her. Notably, however, the trial justice in fact discussed Ms. Rodrigues's testimony at length. With respect to that testimony, he detailed the following: "She admitted that she had absolutely no familiarity with firearms. She never fired any guns. She certainly never shot this one. She didn't know how to take it apart, she didn't even know where the safety catch on the firearm was." Indeed, the trial justice found that "Ms. Rodrigues ultimately turned out to be the State's best witness, so damaging was her testimony to the defendant's interests on cross-examination." While defendant may disagree with that conclusion, the "mere fact that [the] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for a new trial." State v. Rivera, 987 A.2d 887, 903 (R.I. 2010); see also Muralles, 154 A.3d at 932 ("We apply * * * a deferential standard of review [to a trial justice's credibility determinations] because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.") (internal quotation marks omitted).

The trial justice additionally noted, in the second step of his analysis of defendant's motion for a new trial, that the gun was kept "between the couch cushions" and stated: "Putting things between the cushions of a couch in no way diminishes one's possession of them." Moreover, as for defendant's contention on appeal that a reasonable jury could not have found

- 19 -

that he was in constructive possession of the gun because the state did not provide fingerprints or DNA from the gun, the trial justice found that the fact that "no usable fingerprints were found on the gun, or the magazine, or the shell casings, the cartridge casings, [did] not diminish the State's proof at all."

Finally, the trial justice determined whether or not he would have reached a result different from that of the jury. See Moore, 154 A.3d at 480-81. He noted the following with respect to Ms. Rodrigues's testimony:

> "She said that she never told the defendant that the gun was in the apartment. Obviously the jury disbelieved that disclaimer. It's inconceivable to me that the defendant, under all the circumstances, did not know the gun was there. More to the point, any rational fact-finder would easily conclude that the defendant not only knew it was there, but that he also, at the very least, jointly possessed it with Ms. Rodrigues.
> "To be frank, the fact-finder could easily conclude that Ms. Rodrigues had nothing to do with the gun and that it was really the defendant's weapon, not hers."

The trial justice concluded his decision by stating: "In all, including the fair inferences from the evidence, both direct and circumstantial, I think the jury was well-warranted in concluding that this defendant possessed the firearm." Accordingly, the trial justice denied defendant's motion for a new trial.

In our judgment, the trial justice did not commit "clear error or * * * overlook[] or misconceive[] material and relevant evidence [relating] to a critical issue in the case" in denying defendant's motion for a new trial. Muralles, 154 A.3d at 932 (internal quotation marks omitted). Indeed, our review of the record demonstrates ample evidence on the basis of which a jury could reasonably have concluded that defendant was in constructive possession of the gun. The testimony reflected the fact that defendant spent considerable time at Ms. Rodrigues's apartment; received at least one bill in his name at that address; and was, according to Ms.

Rodrigues's own testimony, "[s]ometimes" alone in her apartment. We note as well that Det. Zincone testified that he saw defendant's name on the mailbox and that a confidential informant told him that defendant "resid[ed]" at that address. These facts, coupled with Ms. Rodrigues's testimony that made it clear that she had no experience with or understanding of firearms, certainly constituted enough evidence for a jury to find that defendant constructively possessed the gun. See Ditren, 126 A.3d at 421; Fisher, 844 A.2d at 116.

Accordingly, we are unable to perceive any error in the trial justice's denial of the defendant's motion for a new trial.[10]

### III

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be returned to that tribunal.

---

[10] In view of our holding that the trial justice did not err in denying defendant's motion for a new trial, we need not address defendant's motion for judgment of acquittal. See State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014).

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Tavell D. Yon. |
| **Case Number** | No. 2014-294-C.A. (P2/13-2441AG) |
| **Date Opinion Filed** | June 9, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Lauren S. Zurier<br>Department of Attorney General<br><br>For Defendant:<br><br>George J. West, Esq. |